# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-21158-CR-SCOLA/BANDSTRA

UNITED STATES OF AMERICA

v.

STEVEN STEINER,
a/k/a "STEVEN STEINGER,"

        Defendant.
_____ /

## ORDER ON UNITED STATES'S MOTION FOR ORDER DIRECTING RICHARD LUBIN, ESQ. TO TURNOVER PROCEEDS OF A BOND VIOLATION OR, IN THE ALTERNATIVE, FOR AN ORDER TO SHOW CAUSE WHY COUNSEL SHOULD NOT BE HELD IN CIVIL CONTEMPT

THIS MATTER came before the Court on December 16, 2011 for a hearing on the United States of America's Motion for Order Directing Richard Lubin, Esq. to Turnover Proceeds of a Bond Violation or, in the Alternative, for and Order to Show Cause Why Counsel Should Not be Held in Civil Contempt (ECF No. 519). The Government seeks an order requiring attorney Richard Lubin, Esq. ("Lubin") to the deposit with the registry of the court $750,000, constituting funds Lubin allegedly received in violation of the Order on Initial Appearance of Defendant Steven Steiner ("Steiner") in this case, as well as the specific conditions of two appearance bonds totaling $3.5 million. In the alternative, the Government asks that this Court to enter an order requiring Lubin to show cause why he should not be held in civil contempt for continuing to retain and control these funds.

Lubin has filed a response in which he claims that he is entitled to the funds as part of a legal fee agreement with Steiner that pre-existed the court order and appearance bonds. The Government has filed a reply to Lubin's response. After considering the credible evidence and testimony presented during the hearing, the written submissions of the parties, including the exhibits attached to those submissions, and the arguments of the attorneys in open court, and for reasons more fully set forth below, the Motion is granted.

## PROCEDURAL BACKGROUND

On or about May 3, 2004, Mutual Benefits Corporation ("MBC") was sued by the United States Securities and Exchange Commission ("SEC") in a civil action, *S.E.C. v. Mutual Benefits Corp. et al.,* (No. 04-60573-CIV-MORENO (S.D.Fla.) (the "SEC Fraud Action"). The SEC obtained a restraining order to halt the alleged fraud at MBC, and by order dated May 4, 2004 (the "May 4, 2004 Order"), a receiver (the "MBC Receiver") was appointed by the United States District Court for the Southern District of Florida to identify and oversee the assets and liabilities of MBC.

As part of the May 4, 2004 Order, the MBC Receiver was ordered to "[i]nvestigate the manner in which the affairs of MBC . . . were conducted and institute such actions . . . as the Receiver deems necessary against those individuals [and] corporations . . . which the Receiver may claim have wrongfully, illegally or otherwise improperly misappropriated or transferred monies or other proceeds directly or indirectly traceable from investors in MBC, . . . or against any transfers of monies or other proceeds directly or indirectly traceable from investors in MBC[]." The court further ordered that MBC and its "officers, agents, employees, attorneys, and attorneys-in-fact shall take no action, directly or indirectly, to hinder, obstruct, or otherwise interfere with the Receiver in the conduct of the Receiver's duties."

Steiner was named as a defendant in the SEC Fraud Action as someone who was alleged to have participated in fraud at MBC and to have illegally received proceeds from MBC. Camden Consulting and SKS Consulting were named as relief defendants that were alleged to have illegally received proceeds from MBC and against which a money judgment was sought. Steiner and Henry Fecker ("Fecker") were served with copies of legal documents filed in the SEC Fraud Action.

As part of its efforts to carry out the May 4, 2004 Order and to identify "illegally or otherwise improperly misappropriated or transferred monies or other proceeds directly or indirectly traceable from investors in MBC," the MBC Receiver obtained sworn statements and financial documentation from Steiner, Fecker, Camden Consulting, and SKS Consulting – including sworn depositions from Steiner on October 10, 2005, November 15, 2005, December 4, 2008, and March 5, 2010 – in which Steiner provided testimony under oath concerning, among other things, his assets.

Prior to April 10, 2007, Steiner and Fecker caused the submission of documentation to the SEC and the MBC Receiver containing financial information in order to obtain a favorable settlement of their liability in the SEC Fraud Action, and specifically to seek the agreement of the SEC to a reduced penalty.

Based on documentation and sworn representations and testimony provided by Steiner and Fecker to the SEC prior to April 10, 2007, the SEC agreed to resolve the allegations in the SEC Fraud Action against Steiner, Camden Consulting, and SKS Consulting, jointly and severally, for approximately $5 million. The SEC further agreed to a reduced amount of $3,925,000 based on the financial representations submitted by Steiner and Fecker.

On or about April 10, 2007, the court in the SEC Fraud Action entered a Final Judgment of Permanent Injunction (the "April 10, 2007 Court Order") against Steiner, Camden Consulting, and SKS Consulting. The court ordered and adjudged Steiner, Camden Consulting, and SKS Consulting "jointly and severally liable for disgorgement and pre-judgment interest in the amount of $5 million, representing the proceeds they received as a result of the conduct alleged" in the SEC Fraud Action. The court further ordered that, based upon the "sworn representations in their Statements of Financial Condition, and other documents submitted to [the SEC]," submitted by each of Steiner, Camden Consulting, and SKS Consulting, they "shall together pay $3,925,000" to the MBC Receiver.

On December 9, 2008, the MBC Receiver notified Steiner directly and his former attorney, David Ferguson, of the MBC Receiver's intention to levy and execute judgment, as set forth in the April 10, 2007 Court Order, against the New York Apartment. A courtesy copy of the letter was sent by electronic mail to an attorney from Lubin's law firm.

Steiner's former counsel requested that the MBC Receiver delay recording the judgment so that the purchase price would not be depressed. Steiner's former counsel sent a draft unsigned stipulation stating that Steiner would provide $900,000 of the proceeds of any sale of the New York Apartment to the MBC Receiver in satisfaction of the April 10, 2007 Court Order in an effort to prevent the MBC Receiver from registering the judgment. Steiner never signed the stipulation and the MBC Receiver ultimately registered the judgment in New York State.

On December 4, 2008, Steiner was deposed by the MBC Receiver. Steiner was represented at that deposition by a lawyer from the law firm of Lubin and Metz, P.A. As part of that deposition, Steiner was asked about the New York Apartment. When questioned about the

source of the funds used to purchase the New York Apartment, the lawyer from Lubin and Metz, P.A. directed Steiner to assert his Fifth Amendment privilege.

The Government contends that funds from MBC were used to purchase the New York Apartment. Funds from MBC's general ledger were transferred to an entity controlled by Steiner, SKS Consulting, and deposited in a Northern Trust account controlled by Steiner. The funds from Northern Trust that were used to acquire the New York Apartment are thus traceable to the MBC general ledger. The Government claims that had Steiner not sold the New York Apartment, it would have sought forfeiture of it.

On December 23, 2008, Steiner was charged in the instant case, alleging mail and wire fraud and money laundering conspiracy, related to a scheme to defraud approximately 30,000 investors in an amount exceeding $800 million. Steiner is alleged to be a controlling principal who received more than $10 million in illegal proceeds from the MBC fraud scheme.

On January 8, 2009, Steiner had his initial appearance before a United States Magistrate Judge of the Southern District of Florida, and was released on a $3 million personal surety bond with co-signers, and on a $500,000 10% bond with co-signors. As reflected in the Order on Initial Appearance (ECF No. 35) and the Court Minutes (ECF No. 32), various special conditions were placed on Steiner as part of his bond, including the directive that Steiner not further encumber or dispose of property. Lubin entered his permanent appearance in this matter on behalf of Steiner at Steiner's initial appearance. Lubin was present at the initial appearance when the bond conditions were announced and certainly had access to the public record.

As to the specific bond conditions for Steiner, the handwritten clerk's notes on the Order on Initial Appearance state "not to *further* encumber property," (emphasis added). Steiner signed his $3 million personal surety bond as well as the $500,000 10% bond. Both of the bonds had special conditions selected, including "Item k" (emphasis added below), as follows:

> **None of the signatories may sell, pledge, mortgage, hypothecate, encumber, etc., any property they own, real or personal, until the bond is discharged, or otherwise modified by the Court.**

In addition, both of the bonds contained Penalties and Sanctions Language and contained acknowledgments that the signatories had read, understood, and agreed to comply with the terms of the bond. Both of the bonds became a matter of public record (ECF Nos. 114, 115).

Steiner also signed a Pretrial Instructions Form in the presence of a U.S. Probation Officer, stating that "I understand the above stated instructions and understand that failure to comply will be reported to the Court and may result in the revocation of my bond, causing my detention pending the outcome of my case."  Included on the Pretrial Instructions Form (emphasis added below) was the following:

> **None of the bond signatories may sell, pledge, encumber, mortgage any property they own, real or personal, until the bond is discharged or otherwise modified by the court.**

On December 18, 2009, 11 months after posting the bonds, Steiner sold the New York Apartment to A.C. for $1.3 million.  Steiner thereafter caused the bulk of the sales proceeds to be transmitted to purported creditors by the closing attorney.  These transmittals had the effect of preventing the MBC Receiver from receiving any portion of the proceeds.  Steiner also caused $750,000 of the sales proceeds of the New York Apartment, to be paid by the purchasers directly to Lubin's law firm.

On August 23, 2011, Steiner was indicted in *United States v. Fecker, et al.*, Case No. 11-20578 for, *inter alia,* conduct relating to the sale of the New York Apartment. On September 2, 2011, Magistrate Judge Goodman entered a Detention Order in that case in which he found that the sale of the New York Apartment violated the specific condition of bond prohibiting the sale of any property.

On September 16, 2011, the predecessor trial court in this case entered an Order Revoking, Estreating, and Forfeiting Bond (ECF No. 493).  The court found that in light of the charges against Steiner, there was probable cause to believe Steiner, in violation of the conditions of his bond, engaged in criminal activity while on bond in this case.

## SUMMARY OF GOVERNMENT'S CLAIMS

The Government claims that as a result of the sale and the manner in which it was conducted, Steiner violated at least two bond conditions.  First, Steiner was prohibited from violating any federal, state, or local laws while on release, yet he engaged in a conspiracy to commit money laundering and obstruction of justice, as well as substantive counts of money laundering and obstruction of justice.  He has been indicted on these charges in *United States vs. Henry Fecker, III & Steven Steiner*) (Case No. 11-20578-CR-WILLIAMS) (the "2011 Case").

Second, the Government argues, Steiner was required not to further encumber or sell property, yet he sold the New York Apartment. The New York property transaction thereafter became the subject of a garnishment action brought in February 2010 against Steiner and Lubin by the MBC Receiver in the SEC proceedings. Lubin eventually moved for summary judgment. On November 30, 2010, Magistrate Judge Edwin Torres entered a fourteen page report and recommendation in favor of Lubin, which was later ratified by court order entered by Chief Judge Federico Moreno. Magistrate Judge Torres found that the $750,000 paid to Lubin for the sale of the New York Apartment represented payment of legitimate legal fees owed to Lubin and that once paid, the monies belonged to Lubin and were not Steiner's monies. The Government contends, however, that among other material omissions made by Steiner during the litigation leading up to the issuance of the report and recommendation by Magistrate Judge Torres (and resulting order by Chief Judge Moreno), was the failure to disclose the four separate orders (the orders on initial appearance and the two bond conditions), to the court during the SEC Fraud Action. The Indictment in the 2011 case thus alleges in the obstruction conspiracy count that Steiner's false and fraudulent conduct and material omissions, taken as a whole, did corruptly influence, obstruct, and impede the due and proper administration of justice, including with regard to the issuance of the report and recommendation.

Furthermore, Magistrate Judge Goodman found that the sale of the New York Apartment was a violation of Steiner's Order on Initial Appearance and his two bonds in this case. Citing Steiner's violations of the Order on Initial Appearance and bonds ordering Steiner not to sell or encumber property, Judge Goodman found that "Defendant Steiner has sold and encumbered property since January 8, 2009." Lubin represented Steiner at the detention hearing on August 30, 2011, before Judge Goodman in the 2011 Case. Lubin did not contest the Government's position that the sale of the New York Apartment constituted a bond violation.

Thereafter, Magistrate Judge Goodman entered a Detention Order (ECF No. 20) finding, in part, that Steiner had violated his bond conditions by selling the New York Apartment. Lubin has been on notice of the violation since the day it occurred, but has also been aware that as of August 30, 2011, a court has found this conduct to have constituted a violation. Since the August 30, 2011 hearing, the United States has requested that Lubin turn over to the registry of the court, the $750,000 that he received in violation of Steiner's conditions of bond.

6

On September 19, 2011, the predecessor trial court entered its order revoking, entreating, and forfeiting bond (ECF No. 493) requiring Steiner and his bond co-signers, Suzanne Throgmartin, Caryn Stark, and Lee Sculley, to forfeit the $3 million and $500,000 bonds. Because of the bond violation concerning the sale of the New York Apartment, however, Steiner does not have the financial resources to meaningfully contribute to this forfeiture. The Government claims that it is confounding that his lawyer, Lubin, who was present when the bond conditions were set, could knowingly profit from such a violation and continue to hold these $750,000 funds in light of the factual record. The Government further claims that Lubin should not profit from his client's bond violation and that his unwillingness to return these funds to the court's registry in light of the orders and clear record set forth above is likewise confounding.

On October 7, 2011, Judge Williams held a hearing on the 2011 case and found Steiner entitled to court-appointed counsel under the Criminal Justice Act. The Government claims that given the direct traceability of the $750,000 to the bond violation, and Steiner's apparent lack of financial resources to otherwise satisfy the two appearance bonds totaling $3.5 million that are now forfeitable, immediate turnover should be ordered. It further claims that these funds, once deposited, should be subject to additional motions practice, including an anticipated motion for protective order by the Government to preserve the availability of the funds for forfeiture.

By its motion, the Government seeks to recover these funds which are allegedly not only directly traceable to, and derived from, a bond violation in this case, but which funds are also further directly traceable as proceeds of the MBC fraud scheme. The Government claims that as an officer of the Court, Lubin is not entitled to retain funds that were acquired in violation of a court order and that he should be required to turn over the $750,000 to the registry of the court, so that the funds may be estreated and so that Steiner's bond violation can be further remedied.

In the alternative, Lubin should be required to show cause why he should not be held in civil contempt, the Government argues. *See United States v. McCorkle*, 321 F.3d 1292, 1298 (11th Cir. 2003). In contrast to criminal contempt, "civil contempt sanctions, or those penalties designed to compel future compliance with a court order, are considered to be coercive and avoidable through obedience, and thus may be imposed in an ordinary proceeding." *Id.* at 12989 (quoting *Internal Union, UMWA v. Bagwell*, 512 U.S. 821-28 (1994)). Civil contempt pertains to accidental, inadvertent, or negligent violations of a court order, while criminal contempt

requires willfulness, meaning a deliberate or intended violation. *See In re McDonald*, 819 F.2d 1020 (11th Cir. 1987); *United States v. Baldwin*, 770 F.2d 1550 (11th Cir. 1985).

The United States is not by this motion taking a view as to the intent of Lubin in connection with his conduct involving the transaction and bond violation. The Government claims that it is clear that Steiner was ordered not to sell property, that Steiner sold the New York Apartment, and that $750,000 went to Lubin. According to the Government, it is equally clear that this conduct amounted to a bond violation of Steiner's two appearance bonds and, more specifically, a violation of the Order on Initial Appearance issued by Judge Palermo on January 7, 2009 (ECF Nos. 32, 35).

## **SUMMARY OF LUBIN'S CLAIMS**

Lubin is an attorney in good standing with the Florida Bar, who has been practicing law for more than 37 years. In or around November, 2006, Lubin began representing Steiner in connection with the criminal investigation relating to Steiner's involvement with MBC. This engagement proceeded pursuant to an oral fee agreement whereby Steiner agreed to pay Lubin the sum of $2 million dollars.

In May 2004, Steiner and MBC were sued by the SEC in *SEC v. Mutual Benefits Corp.,* et. al., Case No. 04-60573-CIV-MORENO. Neither Lubin nor his law firm represented Steiner in the SEC proceedings, except for a limited appearance that was entered related to the criminal representations. On May 21, 2008, prior to the criminal indictment, Steiner and Lubin executed an agreement whereby the sum of $750,000 from the proceeds of the sale of the New York Apartment would be paid to Lubin for past and future legal services. To perfect his interest in the anticipated sale proceeds, Lubin executed and filed in New York a UCC lien instrument.

Prior to all this, in connection with the SEC litigation, on April 10, 2007, the Court entered an Agreed Final Judgment against Steiner and related entities in the amount of $5 million and ordered Steiner and the companies to jointly pay $3,925,000 to the MBC Receiver. In December, 2008, the MBC Receiver sent a letter to Steiner's civil attorney, David Ferguson, Esq., threatening to place a lien on the New York property and seeking an agreement that the entire net proceeds from any sale go to satisfy the SEC's final judgment. Steiner never executed the proposed agreement. The MBC Receiver thereafter attempted to register the judgment in New York State, but failed to do so in a manner that made the judgment enforceable.

On December 23, 2008, Steiner was indicted in the instant case. The indictment contained provisions for criminal forfeiture, but did not include Steiner's New York Apartment. Steiner appeared before Magistrate Judge Peter Palermo in Miami, Florida on January 7, 2009 for his Initial Appearance. Steiner was represented by Lubin, who was assisted by his associate, Jonathan Kaplan. The proceeding was recorded by the court's tape system, which malfunctioned on that day and only a minimal portion of the hearing exists.

Lubin and the Government agreed to a personal surety bond totally $3,000,000 along with a 10% $500,000 bond. At the hearing, the sureties were introduced to Magistrate Judge Palermo and the bond was approved. An order setting standard conditions of bond for the $3,000,000 personal surety bond was signed by Magistrate Judge Palermo on January 7, 2009. One of the sureties was given until January 12, 2009 to execute the bond paperwork. Steiner and another surety were given until January 12, 2009 to deposit $50,000 for the 10% bond into the court registry. On January 12, 2009, upon receipt of the $50,000 into the court's registry, Magistrate Judge McAliley, in chambers and without the presence of the respective parties, signed the Order Setting Standard Conditions of Bond for the $500,000, 10% bond.

Prior to the Initial Appearance, Lubin was present while Steiner was interviewed by a pretrial services officer. The report generated by pretrial services was provided to the court, the Government and Lubin at the initial appearance. The report advises that Steiner's New York Apartment was then listed for sale for $1,700,000.

In his written Response, Lubin claims that the Government was aware of the pending sale of the New York property, and because, as discussed below, proceeds from that sale were, in part, promised to Lubin as fees, and were, in part claimed by the SEC and its Receiver, the bond conditions ultimately imposed always contemplated that the New York property sale was ***not*** restricted. In fact, according to Lubin, that is why the handwritten clerk's notes on the Order on Initial Appearance state "not to *further* encumber property," (emphasis added). The other bond paperwork executed in connection with this case with the language that "[n]one of the signatories may sell, pledge, mortgage, hypothecate, encumber, etc., any property they own, real or personal, until the bond is discharged, or otherwise modified by the Court,' are pre-printed conditions that the court clerk checked and, according to Lubin, they do not say anything specific to the New York Apartment.

On December 18, 2009, Steiner sold the New York property. Steiner was represented at the closing by New York attorney Edmond Wolk. According to the closing documents, the sales price was $1,100,000. All duly recorded liens and debts were paid out at the time of closing, including $750,000 to Lubin. Because the MBC Receiver's claim was not duly recorded, the MBC Receiver did not receive any funds from this closing.

The New York property transaction thereafter became the subject of a garnishment action brought in February 2010 against Steiner and Lubin by the MBC Receiver in the SEC proceedings. Lubin eventually moved for summary judgment. On November 30, 2010, Magistrate Judge Edwin Torres entered a fourteen page report and recommendation in favor of Lubin. Magistrate Judge Torres found that the $750,000 paid to Lubin for the sale of the New York property represented payment of legitimate legal fees owed to Lubin and that once paid, the monies belonged to Lubin and were not Steiner's monies. On December 13, 2010, Chief Judge Moreno entered an order adopting Magistrate Torres' report and recommendation and granting Lubin's Motion for Summary Judgment

The litigation relating to the MBC Receiver's protest to the New York property sale and the actual garnishment action were contentious, public, and publicized. Throughout this time period, SEC attorneys and the MBC Receiver were working closely with the Government's criminal investigation. The MBC Receiver's garnishment was filed a month after Steiner's initial appearance in the criminal case. Yet, according to Lubin, for approximately eighteen months, no Government counsel expressed any concern that the sale of the New York property was contrary to Steiner's bond conditions. Lubin posits the simple reason is that the New York property was never intended to be subject to any bond restriction.

On August 30, 2011, in connection with Steiner's indictment in Case No. 11-CR-20578-LENARD, Magistrate Judge Jonathan Goodman conducted a detention hearing. The Magistrate Judge's findings and clarifications order do not speak to Lubin's circumstances, argues Lubin. On September 16, 2011, the predecessor trial court entered an order finding that there was probable cause to believe that Steiner, contrary to his bond conditions, engaged in criminal activities while on bond in this case, and accordingly, that Steiner's bail was forfeited. This order likewise does not speak to Lubin's circumstances, he argues.

Lubin asserts that the Government's motion fails to establish a legal basis for its request that Lubin turnover fees properly earned through the legal representation of a client and fails to establish a legal basis for its request that Lubin should be required to show cause why he should not be held in civil contempt.

Lubin also claims the he should not be held in civil contempt. Civil contempt may only be imposed to compel compliance with a court order or to compensate a party harmed by non-compliance. *McComb v. Jacksonville Paper Co*., 336 U.S. 187, 191 (1949). The following must be established to prove civil contempt: (1) that the alleged contemnor had notice that he was "within the order's ambit"; (2) that the order was "clear and unambiguous"; (3) that the alleged contemnor had the ability to comply; and (4) that the order was indeed violated. *See United States v.Saccoccia*, 433 F.3d at 27 (citations omitted). Civil contempt cannot be established here, he claims, because the order at issue – the bond order – was not clear and unambiguous. Further, Lubin claims he did not violate the bond order.

According to Lubin, the facts surrounding the bond order and the sale of the New York property do not support a finding of contempt or a bond violation as to Lubin. Specifically, the Government was aware of the pending sale of the New York property, proceeds from the sale were promised to Lubin as fees, and the Order on the Initial Appearance contemplates the sale of the New York property because it states "not to *further* encumber property," (emphasis added). Moreover, Lubin argues, he litigated receipt of his fee from the New York property and his fee was validated by the court. Lubin stresses that he has always been open and notorious in relation to receipt of legal fees from the New York property and has always acted transparently and appropriately.

## **SUMMARY OF TESTIMONY**

**Richard Lubin** testified at the hearing as follows. He indicated that he had a fee agreement with Steiner for his representation of Steiner in a criminal investigation prior to the indictment being returned. Specifically, prior to the January 2009 bond hearing, Lubin had received approximately $400,000.00 from Steiner. On May 21, 2008, Lubin and Steiner entered into a written agreement which included a provision that Lubin was entitled to receive $750,000.00 from the sale of the co-op as partial payment of the legal fees owed by Steiner. The co-op was not listed as a forfeitable asset in the indictment. Lubin had a UCC lien on the New

York property, and even though he was aware that the Receiver had a claim for the co-op, Lubin was the only person with a lien on the property. Thus, Lubin felt confident that his lien was superior to any claim by the Receiver and that is why he felt comfortable filing a notice of permanent appearance on behalf of Steiner.

After receiving the $750,000.00 cashier's check from the sale of the co-op, Lubin filed an 8300 form notifying the government of his receipt of the monies. While the litigation was pending before Chief Judge Moreno relating to the Receiver's claim on the $750,000.00, there was never a claim that the sale of the co-op constituted a violation of Steiner's bond.

Further, after the bond conditions were set by Magistrate Judge Palermo, Lubin felt certain that the sale of the New York co-op was not restricted by the bond. After the bond was set and up to and even after the sale of the co-op, neither of the original prosecutors in the criminal case ever indicated to Lubin that there was any problem with the sale of the co-op going forward. Lubin does not recall having any discussion with Magistrate Judge Palermo concerning the sale of the co-op. Lubin recalls a conversation with AUSA Levy, and believes it was in writing, concerning an agreement for a bond for Steiner on the eve of Steiner's indictment. Lubin acknowledged in his writing that it was unlikely that Steiner's New York co-op or Ft. Lauderdale property were going to be available for a bond and was seeking a personal surety bond.

Significantly, Lubin could not recall anything specifically said by Levy concerning the New York co-op, but Lubin must have gleaned from the conversations that Levy thought the co-op was forfeitable. But, once the indictment was returned which did not list the co-op as being forfeitable, Lubin felt the Government had finally accepted Lubin's representation that the co-op was not forfeitable. That is why Lubin filed a permanent appearance. He thought he was going to get the $750,000.00 from the sale of the co-op.

Steiner had agreed to pay $2 million to Lubin for Lubin's representation of Steiner. Lubin had received $400,000.00. With the additional $750,000.00 from the sale of the co-op, Lubin felt that he would be able to represent Steiner and that someday, Steiner would pay him the balance of the fee.

**Special Agent Roy Van Brunt** of the FBI testified at the hearing as follows. He was present on January 7, 2009 at Steiner's bond hearing. According to Van Brunt, the topic of the

New York co-op was not discussed in open court during the hearing. The AUSA and Lubin had conversations concerning the bond prior to the bond hearing that Van Brunt did not participate in. The main issue being negotiated was the self-surrender of Steiner. The gist of the deal was that he would be allowed to surrender.

## **FINDINGS AND CONCLUSIONS**

For the reasons that follow, the Court finds that Lubin must turn over the $750,000 he received from Steiner's sale of the New York Apartment, as that money constitutes direct proceeds of a bond violation.

Lubin maintains that he is entitled to keep the $750,000 because, prior to the setting of bond, he had a valid legal fee agreement with Steiner entitling him to a portion of the proceeds from the sale. Lubin further argues that the Order on Initial Appearance contemplates the sale of the New York Apartment because it merely prohibits the bond signatories from "further encumber[ing]" any property. According to Lubin, his UCC claim on the New York Apartment had been perfected by that time and, therefore, was excluded from the bond's reach. He further contends that his interest in the New York Apartment was open and notorious and that the Government and the court setting bond must, or should, have been aware of it. The Court is not persuaded by these arguments.

Lubin focuses too heavily on the bond condition that property shall not be "further encumber[ed]." However, in addition to prohibiting Steiner from "further encumber[ing]" any property, the bond conditions also provide that the bond signatories shall not *sell* any property. A sale of property is distinct from an encumbrance. To encumber property means "to burden with a legal claim (as a mortgage)." *See Merriam Webster Online Dictionary* (2011), available at: http://www.merriam-webster.com; *cf.* 25 C.F.R. § 84.002 ("Encumber means to attach a claim, lien, charge, right of entry or liability to real property[.]"). Similarly, an encumbrance is "[a] claim or liability that is attached to property or some other right and that may lessen its value, such as a lien or mortgage." *See Black's Law Dictionary* 547 (7th ed. 1999). A sale of property is not defeated by an encumbrance; the two are not one in the same. *See id.* ("An encumbrance cannot defeat the transfer of possession, but it remains after the property or right is transferred.").

More significantly, the Court rejects Lubin's suggestion that the handwritten "no further encumbrances" language on one of the bond papers is a confirmation of some agreement between him, the Government, and the court that the New York co-op would be sold and Lubin would receive the $750,000 to satisfy his UCC lien. When given the chance to specifically testify about any agreement with the Government, Lubin indicated he had no specific recollection of any discussion with a prosecutor in which the sale of the co-op was approved. When given the chance to specifically testify about the sale of the co-op being discussed in front of Magistrate Judge Palermo during the bond hearing, Lubin had no specific recollection. In contrast, Special Agent Van Brunt had a specific recollection of the bond hearing and his unrefuted recollection was that there was no discussion in court about the sale of the New York co-op.

The court finds that no agreement existed between Lubin and the Government or Lubin and the court for the sale of the New York co-op to take place. As the attorney for Steiner, he was aware of the specific court orders prohibiting the sale of any property, real or personal, of Steiner while on bond. At the very least, if he felt the one handwritten note "not to further encumber" created some ambiguity about this issue (which the court finds it did not) he should have sought clarification from the court prior to the sale taking place and prior to receiving funds in violation of court orders. In the light most favorable to Lubin, he seems to have taken the tact of "it is far better to seek forgiveness than permission."

Here, as Magistrate Judge Goodman found, there is no question that the sale of the New York apartment violated the specific condition of bond absolutely prohibiting the *sale* of any property. *See* Detention Order (ECF No. 20), Case No. 11-CR-20578 (Sept. 2, 2011) ("The defendant has engaged in bond violations with regard to the 2008 Case, including the sale of property to include the New York Apartment[.]"). Consequently, it is no answer to say that Lubin is in the clear simply because his UCC claim predated the bond and, therefore, the New York property was not "further encumber[ed]." The sale itself constituted a clear violation of the bond terms; thus, any proceeds acquired because of that sale stemmed directly from a bond violation.

Nor is it any answer to say that Lubin may keep the funds because he himself did not engage in any violation of the bond conditions. Whether it is Lubin's former client, and not

Lubin himself, who committed the breach is of no moment. As an officer of the Court, Lubin may not retain funds that were acquired in violation of a court order, regardless of the identity of the transgressor and regardless of whether Lubin subjectively believed that it was ok. Indeed, to permit Lubin to retain funds derived from the sale of Steiner's New York Apartment would be to condone a Bar member in profiting from his client's direct violation of a bond condition. This Court will not do so.

Accordingly, Lubin is hereby directed to turn over the $750,000 he acquired from the sale of the New York Apartment. Such funds shall be deposited in the court registry forthwith and the Court reserves jurisdiction to determine how and to whom those funds shall ultimately be paid. In light of the Court's belief that Lubin will comply with this order, the Court sees no need to reach the Government's alternative claim for relief of issuing a rule to show cause why Lubin should not be held in contempt of court.

**DONE and ORDERED** this 22nd day of December, 2011

_____
ROBERT N. SCOLA, JR.
UNITED STATES DISTRICT COURT JUDGE

cc: counsel of record